## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| BRYAN FABISZAK and ERICKA FABISZAK, | |
| Plaintiffs, | |
| v. | CAUSE NO.: 2:23-CV-234-TLS |
| THE TOWN OF CEDAR LAKE, INDIANA, CEDAR LAKE POLICE DEPTARTMENT, CORPORAL JAKE HUPPENTHAL, SERGEANT ERIC GODOY, PATROLWOMAN ALEXIS DILLS, and PATROLMAN DUSTIN CORBIN, | |
| Defendants. | |

## OPINION AND ORDER

This lawsuit arises out of events that occurred in the early morning hours of July 9, 2021. Around 1:30 a.m., Town of Cedar Lake police officers were in pursuit of fourteen-year-old Billy Fabiszak in a neighborhood because he was driving his moped without a helmet or a proper operating endorsement. Billy failed to stop when the officers activated their sirens and lights. Instead, he fled to an area where only foot pursuit was possible and then home through his bedroom window. Arriving at the house shortly thereafter, the officers knocked on the front door. Ericka Fabiszak (Billy's mother) opened the door, stepped outside, and called Billy to come outside. Bryan Fabiszak (Billy's father), followed by Billy, came to the front door. As soon as the officers saw Billy, they pushed Ericka out of the way; entered the home; took Bryan to the floor, breaking his nose in the struggle to handcuff him; and grabbed Ericka's wrist when she stepped back toward the house. Plaintiffs Ericka and Bryan Fabiszak bring Fourth Amendment claims for warrantless entry and excessive force; Sixth, Eighth, and Fourteenth Amendment claims; and Indiana state law claims of intentional infliction of emotional distress, assault, and

battery. This matter is now before the Court on the Defendants' Motion for Summary Judgment [ECF No. 31], which is fully briefed and ripe for ruling.

## PROCEDURAL BACKGROUND

On July 6, 2023, Plaintiffs Bryan Fabiszak and Ericka Fabiszak filed a Complaint [ECF No. 1] against Defendants The Town of Cedar Lake, Indiana, the Cedar Lake Police Department, Corporal Jake Huppenthal, Sergeant Eric Godoy, Patrolwoman Alexis Dills, and Patrolman Dustin Corbin, bringing claims based on the events at their home in the early morning hours of July 9, 2021.

Count I alleges federal constitutional claims pursuant to 42 U.S.C. § 1983 for violations of the Plaintiffs' (A) Fourth Amendment right against unreasonable search and seizure for the warrantless entry into their home and for excessive force; (B) Sixth Amendment right to be informed of the nature and cause of the accusations against them; (C) Fourteenth Amendment due process and equal protection rights; and (D) Eight Amendment right against cruel and unusual punishment. Count I also alleges that the Cedar Lake Police Department improperly trained the officers on the entry into a private home, arresting suspects, and using force when effectuating arrests. The Fourth, Sixth, and Eighth Amendment claims are brought against these Defendants through the Fourteenth Amendment.

Count II alleges an Indiana state law claim of intentional infliction of emotional distress based on the individual officers "knocking down, handcuffing, and beating" Bryan in the Plaintiffs' home and in front of their child. Count III brings Indiana state law claims of assault and battery based on the individual officers' use of force against the Plaintiffs.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an

absence of evidence supporting an essential element of the non-moving party's claim; or

(2) presenting affirmative evidence that negates an essential element of the non-moving party's

claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016)

(citation omitted). In response, the non-movant "must make a sufficient showing on every

element of his case on which he bears the burden of proof; if he fails to do so, there is no issue

for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary

judgment, a court must construe all facts and draw all reasonable inferences in the light most

favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the

evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has

one task and one task only: to decide, based on the evidence of record, whether there is any

material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920

(7th Cir. 1994) (citations omitted).

## MATERIAL FACTS[1]

### A.    Billy Fabiszak's Testimony

Billy Fabiszak, son of Plaintiffs Bryan and Ericka Fabiszak, was fourteen years old at the

time of the relevant incident and weighed eighty pounds. Ex. 2, 98:7–8, ECF No. 35-2. Billy had

bought a moped on Facebook Marketplace. Ex. C, 20:3–18, ECF No. 33 (pp. 41–64). He took

the bill of sale and state identification to the BMV and registered and plated it in his name. *Id.*

---

[1] Whether the subject of an objection or on the Court's own review, the Court disregards characterization of evidence in the fact statements and considers the facts only as supported by the cited evidence of record. The Defendants' exhibits are lettered, and the Plaintiffs' exhibits are numbered.

He admits that he did not have a class B or class M sticker on his state identification and did not know that he was required to have one to drive the moped. *Id.*

   In the early morning hours of July 9, 2021, Billy waited for his parents to go to sleep, took the moped to a dead end down the road, started it, and drove to a gas station. *Id.* 20:22–21:16. He was returning to the neighborhood to make a few circles and then planned to go home. *Id.* 21:19–21. He was not wearing a helmet at any time. *Id.* 23:2–4. He testified that, as soon as he turned off the main road into his neighborhood, there was a cop behind him and they "lit us up." *Id.* 21:21–23. In addition to seeing the lights, Billy heard sirens. *Id.* 22:2, 24:20–25:1. Another person on a dirt bike or a moped in front of him "took off"; Billy did not know who the person was. *Id.* 21:24–22:17.

   Officer Dills and Corporal Huppenthal were on routine patrol in the 12900 block of Fairbanks Street that night. Ex. 10, ECF No. 35-10; Ex. 11, ECF No. 35-11. Officer Dills observed a blue moped and a dirt bike driving northbound. Exs. 10, 11. From previous contacts, she recognized Billy as the driver of the blue moped. *Id.* She saw that Billy was not wearing a helmet, and she knew that he did not have the proper MDC Class B endorsement to be operating a moped. *Id.* Officer Dills activated her overhead emergency lights and sirens, but Billy failed to stop. *Id.* Officer Dills knew the address where Billy lived, and she notified other officers to go to the residence. *Id.*

   After hearing the sirens and seeing the lights, Billy sped up and was home in two to three minutes. *Id.*; Ex. C, 26:2–8. He panicked because he was out past curfew. Ex. C, 25:6–22. During the pursuit, the police were behind Billy until he drove toward a dead end he knew of. *Id.* 26:9–12. The dead-end road goes up a hill, and at the very top of the hill, there are six metal stakes that are seven or eight feet high coming out of the ground and are spread apart from each other. *Id.* 26:12–17. Billy drove the moped through the stakes. *Id.* 26:19. However, the police car

4

was blocked, and the officers had to pursue him on foot. *Id.* 26:19–21. Billy looked behind him to see if the police "went for it or if they got out and chased me" and they were "out on foot." *Id.* 27:21–23.

Billy was traveling 35–40 miles per hour at the time he hit the dead end, and the police car was traveling approximately the same speed. *Id.* 26:24–27:7. Billy drove through a field that led to the back of his house. *Id.* 27:8–15. He had just enough time to put the moped behind the house and jump through his bedroom window before he saw flashlights all around the house. *Id.* 27:21–28:3. He panicked and stayed in his room. *Id.* 28:6–7. Less than a minute later, he heard a knock on the front door and knew it was the police. *Id.* 30:16–22. His mom opened the front door, called him to come up, and shut the door. *Id.* 31:6–11.

His dad then came out of his room, and Billy was right behind his dad. *Id.* 31:11–13. His mom opened the front door again to tell him to come outside. *Id.* 32:12–14. As soon as Billy was in sight, the officers shoved his mom out of the way to the side of the front porch. *Id.* 32:14–16, 35:4–19. Two officers grabbed his dad around his arms and dragged him down to the ground. *Id.* 32:16–17, 40:7–19. There was one officer on each arm. *Id.* 40:23–41:2. The officers got his dad on his stomach. *Id.* 42:1–4. One officer had a knee on the back of his dad's head while the other had both knees on his back. *Id.* 43:20–25. They were kneeling on his dad's back and neck, trying to get his hand from under him to put him in handcuffs. *Id.* 37:5–14, 42:1–3. His dad tried to roll over for the officers to put him in handcuffs, and the police were telling him to stop resisting. *Id.* 32:17–20, 43:3–21. The police were trying to pull his hands out from under his stomach. *Id.* 42:22–24. Billy saw him trying to roll over onto his back. *Id.* 42:3–43:7. His dad was using his leg to try to roll onto his back. *Id.* 43:16–19. Billy testified that, when the officer put his knee on his dad's neck, it caused his dad to have his face smashed into the ground, which broke his dad's nose. *Id.* 43:23–44:3. The other officer had one knee on the ground and the other knee on his

dad's back. *Id.* 44:18–22. Billy explained that the officers were trying to yank his dad's hands out from underneath him, which is why they were yelling at his dad to stop resisting. *Id.* 46:8–14. The officer who had his knee on his dad's back backed off a little, which allowed his dad to roll over and give the officers his hands. *Id.* 45:20–46:20.

Billy was taken from the scene in a squad car and transported to the Lake County Juvenile Center. *Id.* 54:1–13.

**B.     Ericka Fabiszak's Testimony**

Ericka testified that the incident occurred around 1:30 a.m. when police officers arrived at their home. Ex. B, 87:13–17, ECF No. 33 (pp. 29–40). She was awoken by pounding on the door, put on a robe, opened the door, stepped out on the porch, and asked what they wanted. Ex. 87:7–13. The officers did not have a warrant and did not announce themselves. Ex. 3, 72:6–12, ECF No. 35-3; Ex. 4, Ans. 31, ECF No. 35-4; Ex. 5, Ans. 31, ECF No. 35-5. She recalled, "The officer started yelling, get Billy, we want Billy out here now." Ex. B, 87:13–14. The officer was irate, and Ericka said, "[C]alm down, it's 1:30 in the morning. I have neighbors." Ex. 3, 71:14–15. Ericka opened the door, called Billy to come outside, and shut the door. Ex. B, 87:19–22. Pressured by the officers that enough time had passed, she opened the door a second time and saw Bryan with Billy behind him walking to the door. *Id.* 87:22–25. The officers pushed her out of the way and entered the house. *Id.* 88:1–2. Ericka testified, "Nobody ever said come on in. They never had a warrant. They weren't supposed to come in my house." Ex. 3, 72:6–8. She did not block their way or try to stop them. Ex. 4, Ans. 31. She mentions specific officers, including Corbin and Huppenthal, as the ones who entered the house and were involved in the physical altercation with Bryan. Ex. B, 88:19–20. She testified, "I see them fighting my husband. One of them gets him in the nose. I see them -- a knee -- a knee on my husband's back or neck." *Id.* 91:13–15. Ericka said the officers were "[b]eating the hell out of" Bryan, tackling him and

6

slamming him to the ground. *Id.* 91:5–8, 20–23. She testified that "[o]ne of them gets him in the nose" while telling him to "quit resisting." *Id.* 91:14–16. Bryan was handcuffed after he was hit in the nose. *Id.* 98:8–11. The officers rolled Bryan over, handcuffed him, and stood him up. *Id.* 98:3–5, 17–19. Once Bryan was on his feet, nothing rough happened. *Id.* 99:12–15. Bryan was checked at the ambulance and asked if he wanted to go to the hospital, but he declined. *Id.* 99:17–19. Officer Godoy removed Bryan's handcuffs and told Ericka that they were not taking Bryan because they did not want to be responsible for his injuries. *Id.* 99:19–22.

Meanwhile, Ericka was standing outside, a few feet from the porch, yelling at the officers to get off Bryan. *Id.* 101:14–19, 102:1–4. She was yelling, "You're going to kill him. Please, he's on a blood thinner. He could bleed to death. He could bruise and die." *Id.* 101:19–21. Ericka stepped forward with her right foot, and Officer Dills grabbed her wrist as if Ericka was going to go inside; Ericka pulled away "like I'm not going anywhere." *Id.* 101:21–25, 102:24–104:15. When Officer Dills grabbed her wrist, Ericka urinated on herself. *Id.* 103:11–14. Ericka did not move after that and did not go back into the house until the officers took Bryan and Billy out of the house. *Id.* 104:15–22. Officer Dills did not twist Ericks's wrist, and Ericka had no other physical interaction with the officers at the scene. *Id.* 104:23–105:16. Ericka was not threatening the officers or acting disrespectfully. Ex. 4, Ans. 31. Ericka stayed up until 4:30 a.m. to be sure Bryan did not bleed out. Ex. B, 99:22–24. Ericka testified that Officers Corbin, Huppenthal, Dills, and Godoy were at the Plaintiffs' home at the time of this incident. *Id.* 88:17–22.

Prior to the occurrence, Ericka had undergone surgery to the same wrist that was grabbed by Officer Dills. *Id.* 105:5–7, 109:20–24. Ericka was supposed to wear a cast when she went out, but she did not put her cast on when she got out of bed just before this incident. *Id.* 105:8–12.

7

C.    **Bryan Fabiszak's Testimony**

Bryan testified he had gone to bed around 9:00 or 9:30 p.m. and believed the rest of the family was asleep. Ex. A, 66:7–17, ECF No. 33 (pp. 12–28). He was awakened by a loud pounding on the door around 1:30 a.m. *Id.* 83:11, 83:20–23, 94:13–18; Ex. 2, 86:4–7, ECF No. 35-2. Ericka answered the door, and five to six police officers were outside. Ex. A, 94:18–20. Bryan put on a pair of shorts and went to the door behind his wife, who told him the officers were looking for Billy. *Id.* 96:3–97:1. Billy came out from his bedroom. *Id.* 97:1–2. Once Billy was visible, three officers "barreled" through the door. *Id.* 97:2–3, 102:23–25.[2] Bryan did not block the officers or try to stop them. Ex. 5, Ans. 31. One officer tackled Bryan, causing him to land on his knee and roll backward. Ex. A, 97:4–5. While he was on his back, an officer was screaming at him to roll over, but he could not move because the officer was on top of him. *Id.* 97:5–8. The officers were yelling at him to quit resisting, and he told them he was trying to roll over. *Id.* 103:12–104:6. That's when he was hit in the nose and an officer placed a knee on the back of his neck. *Id.* 104:5–10. After that, Bryan could not breath very well. *Id.* 104:12–13. He was placed in handcuffs but was not arrested. *Id.* 106:25–107:4. He had bruised ribs because of the incident. Ex. 2, 63:6–11. Bryan identified Officers Corbin and Godoy as officers involved and believes it was Officer Corbin who "drew back and kneed [him] in the nose." *Id.* 58:7–14; Ex. A, 102:3–16. Bryan was on blood thinners at the time of the occurrence, and his broken nose was bleeding. Ex. A, 108:9–12. Bryan was checked at the ambulance outside. *Id.* 108:12–16. Officer Corbin or Godoy came over to Bryan at the ambulance and told him, "[Y]ou're free to

---

[2] The Defendants object to the Plaintiffs' citation in their Statement of Additional Material Facts ¶ 102 to Bryan's testimony that the officers came "barreling through the door" on the basis that the phrase is argumentative and prejudicial. ECF No. 39, p. 8 (citing Pl. Ex. 2, p. 102:22–25, ECF No. 35-2). However, the Defendants quoted the same testimony in their own Statement of Material Facts ¶ 68, ECF No. 33, p. 10 (citing Ex. A, pp. 97:1–17, 102:19–25). Thus, the Court overrules the objection as waived.

go, we're not pressing charges, you're not arrested because we don't want to be liable for anything that happens to you in jail." *Id.* 108:17–21. Billy was arrested. *Id.* 107:10–11.

Bryan states that, during the incident, he was not resisting, impeding the officers from arresting Billy, yelling at them, threatening them, or acting disrespectfully. Ex. 5, Ans. 31.

Prior to this incident, Bryan had been severely injured in a car versus motorcycle accident, and his injuries included broken tibias, broken fibulas, shattered knees, shattered ankles, shattered toes, shattered feet, a shattered pelvis, and a blown-out hand right hand and left wrist. Ex. 2, 10:15–11:17. Bryan weighed approximately 140 pounds at the time of the incident, while the officers weighed 180–200 pounds. *Id.* 97:10–11. It was very difficult for Bryan to move early in the morning due to his prior injuries. *Id.* 103:14–17.

During his deposition, Bryan authenticated a body cam video clip depicting him interacting with Cedar Lake Police on a separate occasion when he was collecting his clothes and leaving his wife. Ex. A, 126:13–22. In the video, Bryan is heard saying to Cedar Lake Police Officers, including several of the officers who are Defendants in this case, that the current lawsuit is dropped. *Id.* 127:4–10. He testified that he made that statement because he wanted to get "under my wife's skin" and, "[a]s you can see, we're still going through with [the lawsuit]." *Id.* 127:24–128:3. In reference to the incident in this case, in the video he said that he and his family "all deserved what the fuck happened to us," which he also said to make his wife mad. *Id.* 128:22–129:17. Bryan testified he "was referring to tickets not the injuries." *Id.* 128:25–129:1.

### D.    Cedar Lake Police Department Policies

The Defendants had no written policies or procedures for entering a residence without a warrant. Ex. 12, Ans. 4, 13, ECF No. 35-12; Exs. 13–16, Ans. 23, ECF Nos. 35-13 to 35-16.

**ANALYSIS**

The Defendants move for summary judgment on all the Plaintiffs' claims. As an initial matter, the Court sua sponte dismisses with prejudice the Cedar Lake Police Department because it is not a suable entity under Indiana law. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011) ("[T]he Indiana statutory scheme does not grant municipal police departments the capacity to sue or be sued."). The Town of Cedar Lake, Indiana, is the proper municipal defendant.

**A.    Federal Constitutional Claims under 42 U.S.C. § 1983**

42 U.S.C. § 1983 "provides a remedy for violations of federal rights committed by persons acting under color of state law." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). The Plaintiffs bring their § 1983 claims under the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The Court considers each constitutional claim in turn.

*1.    Fourth Amendment—Warrantless Entry of the Plaintiffs' Home and Excessive Force*

The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV; *see Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 380 n.1 (7th Cir. 2019). The Plaintiffs allege that the Defendants violated their Fourth Amendment rights to be free from a warrantless entry into their home and to be free from the officers' use of excessive force.

a.    Fourth Amendment—Warrantless Entry of the Plaintiffs' Home

The Fourth Amendment protects the Plaintiffs' right "to be secure" in their "hous[e]" from "unreasonable searches and seizures." *United States v. Banks*, 60 F.4th 386, 388 (7th Cir.

10

2023) (quoting U.S. Const. Amend. IV). The "very core" of that protection is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). This "means that law enforcement officers must have a warrant to enter [a home], unless one of a few limited exceptions applies." *Banks*, 60 F.4th at 389 (citing *Lange v. California*, 594 U.S. 295, 301 (2021)). For example, warrantless entry is allowed when the officers face exigent circumstances, the resident consents to entry, or the officers conduct a knock-and-talk. *Id.* (citing *Lange*, 594 U.S. at 301).

The exigent circumstances exception "applies when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable.'" *Lange*, 594 U.S. at 301 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). Several exigencies have been recognized by the United States Supreme Court, such as "to render emergency assistance to an injured occupant, to protect an occupant from imminent injury, or to ensure [the officer's] own safety" and "to 'prevent the imminent destruction of evidence' or to 'prevent a suspect's escape.'" *Id.* at 301–02 (cleaned up) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)). And, at issue in this case, the "hot pursuit" of a suspect may constitute exigent circumstances. *See id.*; *United States v. Santana*, 427 U.S. 38, 42–43, 43 n.3 (1976).

The Defendants argue that they are entitled to summary judgment because the officers were in "hot pursuit" of Billy as a fleeing felon at the time they made the warrantless entry into the Plaintiffs' home. The Defendants cite *Santana*, 427 U.S. at 43, in which the United States Supreme Court upheld a warrantless entry when police were in "hot pursuit" of a fleeing suspect. "Hot pursuit" requires the "immediate or continuous pursuit of the [suspect] from the scene of a

crime." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). In *Santana*, the police officers drove to Santana's house with probable cause to believe she was dealing heroin, which was a felony under the applicable law. 427 U.S. at 40. When the police drove up, Santana was standing in the doorway of the house; when the police yelled "police," Santana "retreated into [the house's] vestibule." *Id.* Upholding the subsequent warrantless entry, the Supreme Court cited "a realistic expectation that any delay would result in destruction of evidence" such that the officers "need[ed] to act quickly." *Id.* at 42–43. But the Supreme Court "framed [the] holding in broader terms: Santana's 'act of retreating into her house' . . . could 'not defeat an arrest' that had 'been set in motion in a public place.'" *Lange*, 594 U.S. at 304 (quoting *Santana*, 427 U.S. at 42–43).

The Defendants also cite *White v. Hefel*, 875 F.3d 350 (7th Cir. 2017), in which the "hot pursuit" exception was applied to a fleeing juvenile who fled into someone else's house. In *White*, officers observed a juvenile standing on a street corner in a high crime neighborhood. *Id.* at 353, 356. When the officers approached him, the juvenile fled. *Id.* at 353. The officers pursued the juvenile partly in their squad cars and partly on foot. *Id.* The juvenile, seeing an opportunity, ran inside the plaintiff's house through the unlocked front door and locked himself in; the plaintiff and his family were outside. *Id.* at 354. The officers kicked in the door and proceeded to search the house. *Id.* On the plaintiff's § 1983 Fourth Amendment claim, the Seventh Circuit found that the officers had probable cause to believe the juvenile had committed the crime of trespass. *Id.* at 356. The court then found in favor of the officers under the hot pursuit exception to the warrant requirement. *Id.* at 357 (citing *Santana*, 427 U.S. at 42–43). The court reasoned that the "officers were in hot pursuit of a fleeing suspect. They were hardly going to shout into the house and ask [the juvenile] to mark time while they checked in with a state judge." *Id.* The court did not discuss whether the criminal trespass was a felony or a misdemeanor under Illinois law.

In 2013, the Supreme Court in *Stanton v. Sims*, which concerned a fleeing misdemeanor suspect, noted its "precedent holding that hot pursuit of a fleeing *felon* justifies an officer's warrantless entry." 571 U.S. 3, 8 (2013) (emphasis added) (citing *Welsh*, 466 U.S. 750 (citing *Santana*, 427 U.S. 42–43)). Thus, while courts nationwide generally treated the hot pursuit of a fleeing felon as a categorical exception to the warrant requirement following *Santana*, courts were "sharply divided" on whether the hot pursuit of a fleeing misdemeanor suspect was a categorical exception. *See id.* at 6 (citing cases); *Caniglia v. Strom*, 593 U.S. 194, 204–05 (2021) (Kavanaugh concurrence) ("[T]he exigent circumstances doctrine allows officers to enter a home without a warrant . . . to engage in hot pursuit of a fleeing felon . . . ."); *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003) ("The Supreme Court has characterized . . . as exigent circumstances . . . [the] hot pursuit of a fleeing felon . . . ." (citing *Minnesota*, 495 U.S. at 100)).

On June 23, 2021, sixteen days before the events in this case, the Supreme Court in *Lange v. California* answered the question of "whether the pursuit of a fleeing *misdemeanor* suspect always—or more legally put, categorically—qualifies as an exigent circumstance," holding that "it does not." 594 U.S. at 299 (emphasis added). The Supreme Court recognized that its "cases have generally applied the exigent-circumstances exception on a 'case-by-case basis.'" *Id.* at 302 (citing *Birchfield v. North Dakota*, 579 U.S. 438, 457 (2016)). This requires "'looking at the totality of the circumstances' confronting the officer as he decides to make a warrantless entry." *Id.* (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). Holding that the case-specific approach applies to a fleeing misdemeanor suspect, the Supreme Court explained, "When the nature of the crime, the nature of the flight, and surrounding facts present no such exigency, officers must respect the sanctity of the home—which means that they must get a warrant." *Id.* at 308–09. The Supreme Court declined to decide whether *Santana* established a categorical rule for the hot pursuit of a fleeing felon: "[W]e see no need to consider Lange's

counterargument that *Santana* did not establish *any* categorical rule—even one for fleeing felons. Assuming *Santana* treated fleeing-felon cases categorically (that is, as *always* presenting exigent circumstances allowing warrantless entry), it still said nothing about fleeing misdemeanants." *Id.* at 304–05 (citations omitted).

In the instant case, the Defendants contend that the "hot pursuit" exception under *Santana* applies because Billy's actions on the morning of July 9, 2021, were a felony under Indiana law when he fled the police on his moped. Indeed, Indiana Code § 35-44.1-3-1 provides that a person commits resisting law enforcement, a Class A misdemeanor, by "knowingly or intentionally . . . flee[ing] from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop." Ind. Code § 35-44.1-3-1(a)(3). Under the law in effect at the time, the offense is elevated to a Level 6 felony when the "person uses a vehicle to commit the offense." *Id.* § 35-44.1-3-1(c)(1)(A) (eff. July 1, 2021 to June 30, 2024). A vehicle is defined as "a device for transportation by land, water, or air. The term includes mobile equipment with provision for transport of an operator." *Id.* § 35-31.5-2-346.[3] The offense is also a Level 6 felony if, "while committing the offense, the person . . . operates a vehicle in a manner that creates a substantial risk of bodily injury to another person." *Id.* § 35-44.1-3-1(c)(1)(B)(iii) (eff. July 1, 2021 to June 30, 2024).

Billy testified that he saw the police car with its lights and heard the sirens but decided to flee, leading the officers on a vehicular chase through the neighborhood at speeds of 35–40 miles

---

[3] The definitions in Article 31.5 "apply throughout [Title 35, Criminal Law and Procedure] and to all other statutes relating to penal offenses." Ind. Code § 35-31.5-1-1. Recently, the Indiana Court of Appeals held that Indiana Code § 35-31.5-2-346 is not unconstitutionally vague as applied to the defendant, who was fleeing on a bicycle and was found guilty of resisting law enforcement using a vehicle under Indiana Code § 35-44.1-3-1(a)(3). *Beasley v. State*, 251 N.E.3d 582, 2024 WL 5252264, at *2 (Ind. Ct. App. 2024), *transfer denied*, 255 N.E.3d 435 (Ind. 2025).

an hour. He led them to a dead end with tall metal stakes the officers' vehicle could not pass through, riding between the stakes on his moped. Billy fled to his house and climbed in through his bedroom window. Less than a minute passed before his mother Ericka was interacting with police at the front door. Thus, the officers were actively pursuing Billy when they entered the Plaintiffs' home. And, under the applicable objective standard, the officers had probable cause to believe that Billy committed a felony because he was resisting arrest using a vehicle.

In response, the Plaintiffs contend that there was no probable cause to believe Billy was committing a misdemeanor, much less a felony, because the Defendants offer no evidence that they "ordered [Billy] to stop" as required by Indiana Code § 35-44.1-3-1. However, the plain language of the statute provides that a person commits resisting arrest when the person knowingly or intentionally "flees from a law enforcement officer after the officer has, by visible or audible means, *including operation of the law enforcement officer's siren or emergency lights*, identified himself or herself and ordered the person to stop." Ind. Code § 35-44.1-3-1(a)(3) (emphasis added). Billy admitted that he noticed the police car with its lights and sirens, which constitutes an order to stop under the statute. *See United States v. Metts*, No. 24-3196, 2025 WL 1672869, at *1 (7th Cir. June 13, 2025) ("A police officer may order someone to stop by activating their siren or emergency lights." (citing Ind. Code § 35-44.1-3-1(a)(3))). The Plaintiffs do not challenge the officers' initial order to stop based on Billy operating the moped without a helmet or the proper endorsement.

Ignoring that the use of the vehicle alone elevates the misdemeanor of resisting arrest to a Level 6 felony, the Plaintiffs next argue that the misdemeanor of resisting arrest cannot be elevated to a Level 6 felony in this case based on creating a substantial risk of bodily injury to another person under § 35-44.1-3-1(c)(1)(B)(iii). The Plaintiffs reason that there is no evidence of a speed limit, that Billy almost hit someone, or that anybody was present who could be

15

injured. Yet Billy was traveling at speeds of 35–40 miles per hour on his moped in a residential neighborhood at night and passed between tall metal stakes at the end of a road at the top of a hill while the officers were in pursuit behind him in a vehicle that would be blocked by the stakes. Relevant to the qualified immunity analysis below, the officers could have reasonably believed that this inherently created a substantial risk of bodily injury to the pursuing officers. *See Fleming v. Livingston County*, 674 F.3d 874, 880 (7th Cir. 2012) ("Arguable probable cause is established when a reasonable [official] in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." (cleaned up)). Thus, it was reasonable for the officers to believe that Billy was committing a Level 6 felony of resisting arrest because he used a vehicle, and it was also arguably reasonable for them to believe he was committing a Level 6 felony of resisting arrest because he created a substantial risk of bodily injury to another person when using the vehicle.

Finally, the Plaintiffs argue that, after *Lange*, a fourteen-year-old on a moped hardly constitutes an "emergency" situation and that, when examining these circumstances on a case-by-case basis, the hot pursuit exception should not apply. This Court notes that, after *Lange*, the district court in *Dupree v. Village of Bellwood* cautioned against warrantless entry "where the felonious conduct relied upon by the officers to justify a warrantless entry is the flight itself (from a ticketable traffic offense), rather than, as in the key Supreme Court precedents, an underlying felony or misdemeanor." No. 18-CV-08304, 2022 WL 2715008, *5 (N.D. Ill. July 13, 2022). Although not addressed by the parties, the failure of a minor (an individual under eighteen years old) to wear a helmet while operating a moped and the failure to have the proper operating endorsement are Class C infractions under Indiana law. *See* Ind. Code §§ 9-19-7-1(b)(1)

(helmet), 9-19-7-3 (helmet classification of violation), 9-21-11-12(2)(A) (operating

endorsement), 9-21-11-14 (operating endorsement classification of violation).

Based solely on Billy's young age of fourteen, the relatively low speed of the moped, the

late time of night, that the only felony was the fact of fleeing itself from Class C infractions, and

that Billy fled into his own home, a case-by-case analysis might suggest these were not exigent

circumstances sufficient for a warrantless entry into the Plaintiffs' home following *Lange*. *See,*

*e.g.*, *Caldwell v. Patston*, No. 2:19 CV 428, 2021 WL 4439755, at *4 (N.D. Ind. Sept. 28, 2021)

(rejecting the defendants' argument that the warrantless entry into Caldwell's home was

reasonable because Caldwell fled and the officers were in active pursuit of him, explaining that

"Defendants' argument is precisely the type of categorical application of the hot pursuit exigent

circumstance exception that the Supreme Court rejected in *Lange*" and that "the only case

defendants cite, *White v. Hefel*, 875 F.3d 350, 357 (7th Cir. 2017), is plainly distinguishable, as

the suspect in *White* fled into a stranger's home, rather than his own" but ultimately finding

exigent circumstances based on what an officer knew of Caldwell's history such that a

reasonable officer "would have been justified in the belief that an emergency situation existed

and a warrantless entry into Caldwell's home was necessary to protect the officers, public, and/or

prevent Caldwell's escape").[4]

In their reply brief, the Defendants reason that the context and circumstances justified an

exception because fourteen-year-olds can commit crimes and Billy's flight could have been an

attempt to dispose of contraband or evidence. But the Defendants did not advance this

---

[4] In rejecting the argument that a misdemeanor suspect's flight changes the calculus sufficiently to create
a categorical rule, the Supreme Court in *Lange* gave as an example "the teenager 'driving without
taillights' who on seeing a police signal 'did not stop but drove two blocks to his parents' house, ran
inside, and hid in the bathroom'" and commented that, "[i]n such a case, waiting for a warrant is unlikely
to hinder a compelling law enforcement need." 594 U.S. at 308 (quoting *Mascorro v. Billings*, 656 F.3d
1198, 1202, 1207 (10th Cir. 2011)). The Supreme Court commented, "In misdemeanor cases, flight does
not always supply the exigency that this Court has demanded for a warrantless home entry." *Id.*

justification in their opening brief and, more importantly, they offer no evidence to suggest that a reasonable officer would have believed that Billy possessed contraband or evidence to be destroyed. *See United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) (recognizing that a police "officer cannot, without some other suspicious activity, justify a warrantless entry based solely on the fear that evidence might be destroyed" (citation omitted)); *United States v. Collins*, 510 F.3d 697, 699 (7th Cir. 2007) (finding it insufficient if the officers only have "probable cause to believe that the house was occupied and contained contraband or evidence of crime" for purposes of the exigent circumstances exception to the warrant requirement to search a home).

Here, it is unnecessary to decide whether the officers' warrantless entry of the Plaintiffs' home in pursuit of Billy violated the Fourth Amendment because the Court finds the officers are entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021); *Rodriguez v. City of Berwyn*, No. 16 C 5106, 2018 WL 5994984, at *9–10 (N.D. Ill. Nov. 15, 2018) (declining to decide whether the warrantless entry violated the Fourth Amendment because the officer was entitled to qualified immunity). Qualified immunity, which "shields public officials 'from undue interference with their duties and from potentially disabling threats of liability,'" *Smith*, 10 F.4th at 737 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)), "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions' and 'protects all but the plainly incompetent or those who knowingly violate the law,'" *id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). It is the plaintiff's burden to overcome the affirmative defense once raised. *Id.* (citing *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008)). To overcome the defense, a plaintiff must show (1) "a violation of a constitutional right" and (2) that "the federal right at issue was clearly established at the time of the alleged violation." *Id.* (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2015)).

Here, the Plaintiffs have failed to show that it was clearly established at the time that it was unconstitutional for the officers to pursue Billy—an individual suspected of the felony of fleeing law enforcement—into his home without a warrant. "A constitutional right is clearly established if 'the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 742 (citation omitted). "The clearly established right must be defined with specificity." *Id.* (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)). Courts look to "whether precedent squarely governs the facts at issue." *Id.* Thus "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Kemp v. Liebel*, 877 F.3d 346, 351–52 (7th Cir. 2017) (citation omitted). The question is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (citation omitted). Although a plaintiff need not identify a case directly on point, "the legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him." *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (citation omitted).

The Plaintiffs cite only *Lange v. California.* But as discussed above, *Lange* was concerned with whether the hot pursuit exception to the warrant requirement applied categorically or on a case-by-case basis to the hot pursuit of a fleeing misdemeanor suspect and did not disturb the prior Supreme Court decisions describing the hot pursuit of a fleeing felon as a categorical exigent circumstance exception to the warrant requirement. The Plaintiffs identify no law at the time of this incident on July 9, 2021, holding that the hot pursuit of an individual suspected of a minor felony, such as the felony of fleeing law enforcement by use of a vehicle or by causing the substantial risk of bodily injury in the use of the vehicle, was not an exigent circumstance under *Santana* such that the warrantless entry was unconstitutional.

Under *Santana*, *White*, and the other Supreme Court precedent cited above describing as categorical the exception for the hot pursuit of a fleeing felon, the officers did not have fair warning that their entry into the Plaintiffs' home in pursuit of Billy, a fleeing felon—albeit a felon only because he was suspected of using a vehicle to resist arrest for a Class C infraction— was unconstitutional under the circumstances presented. A reasonable officer in their place would have believed that Billy fleeing on his moped after the officers ordered him to stop by activating their sirens and lights, including causing the substantial risk of bodily injury to the officers by his use of the moped (as discussed above), provided sufficient probable cause to arrest Billy for felony resisting arrest and that the resulting brief and continuous "hot pursuit" entitled them to enter the house to arrest him under *Santana*. In other words, because the common understanding at the time was that *Santana* permitted the warrantless entry of a home in hot pursuit of a fleeing felon and because *Lange*, which was concerned with whether there is a categorical rule for fleeing misdemeanor suspects, did not disturb that common understanding for fleeing felons, a reasonable officer would have believed the officers could enter the Plaintiffs' home without a warrant to arrest Billy.

Accordingly, the Court finds that Defendants Corporal Jake Huppenthal, Sergeant Eric Godoy, Patrolwoman Alexis Dills, and Patrolman Dustin Corbin are entitled to qualified immunity and grants summary judgment for them on the Fourth Amendment warrantless entry claim in Count I(A).

b.    Fourth Amendment—Excessive Force

"The Fourth Amendment prohibits the use of excessive force to seize a person in order to arrest her." *Gupta v. Melloh*, 19 F.4th 990, 995–96 (7th Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). A Fourth Amendment excessive force claim is governed by the objective reasonableness standard. *Brumitt v. Smith*, 102 F.4th 444, 447 (7th Cir. 2024) (citing

*Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). Whether an officer's use of force is objectively reasonable depends on the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see Brumitt*, 102 F.4th at 447. Summary judgment in excessive forces cases is often denied because "parties typically tell different stories about what happened." *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009). The Court considers the motion as to each Plaintiff in turn.

1)      Bryan Fabiszak

The Defendants argue that they are entitled to summary judgment on Bryan's excessive force claim because the officers' use of force was objectively reasonable. Here, there are separate questions of whether the initial use of force was even warranted and then whether the amount of force used once Bryan was taken to the ground was objectively reasonable. *See Turner v. City of Champaign*, 979 F.3d 563, 568 (7th Cir. 2020) (identifying two distinct issues as the initial use of force and the force subsequently used to subdue the plaintiff); *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage."); *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) ("In some cases each discrete use of force must be separately justified." (citing *Deering*, 183 F.3d at 652)).

First, the Defendants' motion does not address the two officers' initial use of force when they grabbed Bryan's arms and took him to the ground but instead focuses on whether, once on the ground, Bryan was resisting at the time his nose was broken. Notably, the Defendants offer no evidence that Bryan was acting in a way that warranted that initial use of force. In contrast, the Plaintiffs offer evidence that Bryan was walking to the front door with Billy behind him

when the officers "barreled" through the door into the house, grabbed Bryan's arms, and took Bryan to the ground. Bryan was not blocking the officers or trying to stop them as they entered the home and approached Billy. Bryan weighed 140 pounds, whereas the officers weighed 180–200 pounds each. There is no evidence that Bryan was suspected of having committed any crime. In reply, the Defendants offer no defense of the officers' initial use of force.

Although Bryan and Ericka did not invite the officers into their home, there is no evidence that they tried to stop the officers from entering, and the facts viewed in the light most favorable to the Plaintiffs are that Bryan was simply coming to the front door with Billy following him. A reasonable jury could find that the officers' initial use of force to take Bryan to the ground was objectively unreasonable because Bryan had committed no crime, was not a threat to the safety of the officers or his family, was not preventing the officers from interacting with Billy, and had not said or done anything to warrant their use of physical force. *See, e.g.*, *Joshua v. Wachholz*, No. 22-CV-24, 2023 WL 3040641, *1, 3–4 (W.D. Wis. Apr. 21, 2023) (finding a jury could reasonably conclude that the officer's initial use of force was objectively unreasonable because there was a dispute of fact as to whether the plaintiff was a physical threat and was physically retreating), *appeal dismissed*, No. 23-1810, 2024 WL 1832986 (7th Cir. Mar. 7, 2024); *Pekrun v. Puente*, 172 F. Supp. 3d 1039, 1044–45 (E.D. Wis. 2016) (finding a jury could reasonably conclude that the officer's initial use of force was unreasonable where the officer did not identify himself as a police officer to the plaintiff who was riding a bicycle, did not order the plaintiff to stop, did not warn the plaintiff he would use force if the plaintiff did not stop, and only suspected the plaintiff of committing a very minor offense and where the plaintiff had not engaged in any behavior to suggest he posed a threat to anyone's safety or would flee if ordered to stop).

Second, there is also a question of fact as to whether the officers' use of force was reasonable in taking Bryan to the floor and handcuffing him. Two officers grabbed Bryan's arms and forced him to floor. Once they had him on the ground, the officers were yelling at Bryan to roll over so they could handcuff him, but the officers were also preventing him from rolling over by pinning him to the ground. While the Plaintiffs and Billy testified that the officers were yelling at Bryan to stop resisting so they could handcuff him, they also testified that Bryan was not resisting but was attempting to roll over so that he could be handcuffed. At one point, Bryan's nose was broken by one of the officers; he could not breathe once his nose was broken and an officer had a knee on his neck. A reasonable jury could find that an officer intentionally kneed Bryan in the nose, as Bryan was willingly rolling over onto his stomach to be handcuffed when his nose was broken and Bryan testified the officer "drew back and kneed [him] in the nose." *See Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013) ("[I]t [is] well-established in this circuit that police officers [cannot] use significant force on nonresisting or passively resisting suspects."); *Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019) ("Taking the facts in the light most favorable to [the plaintiff], a jury could conclude that [the officer] delivered a kick. And there is no doubt that an unnecessary kick, after a suspect is under control, violates the suspect's clearly established rights."). Although Bryan, Ericka, and Billy all give slightly different versions of how Bryan's nose was broken, none are materially inconsistent for purposes of determining whether the use of force was objectively reasonable. Viewing the facts in the light most favorable to the Plaintiffs, a reasonable jury could find that the officers' use of force to get Bryan in handcuffs by pinning him to the ground, kneeling on his neck and back, and breaking his nose was objectively unreasonable when Bryan was trying to comply with their orders.

The Defendants are not entitled to qualified immunity on either of Bryan's Fourth Amendment claims because it was clearly established at the time that it is unconstitutional for an officer to use force on someone who was not resisting. *See Becker v. Elfreich*, 821 F.3d 920, 928–29 (7th Cir. 2016) (recognizing that, prior to 2011, "it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects" (quoting *Abbott*, 705 F.3d at 732)). Accordingly, the Court denies the Defendants' motion for summary judgment on Plaintiff Bryan Fabiszak's Fourth Amendment claims of excessive force as to both the officers' initial use of force and the force used to control and handcuff Bryan.

2)      Ericka Fabiszak

Ericka's Fourth Amendment excessive force claim is based on Officer Dills grabbing Ericka's wrist when they were outside the front door observing the interaction between Bryan and the officers inside the house. Ericka was yelling and stepped forward toward the house when Officer Dills grabbed her wrist but did not twist it. The Defendants move for summary judgment on the basis that Officer Dills did not use excessive force because a reasonable officer in Officer Dills' position would have believed that Ericka may be attempting to enter the house and the force was minimal. Courts within the Seventh Circuit Court of Appeals have found that grabbing a plaintiff's wrist under similar circumstances was objectively reasonable. *See Brown v. Pankow*, No. 21-CV-2114, 2023 WL 4312775, at *7–8 (C.D. Ill. Apr. 24, 2023), *appeal dismissed*, No. 23-2305, 2024 WL 3250377 (7th Cir. May 6, 2024). No reasonable jury could find that the de minimis amount of force used by Officer Dills to prevent Ericka from going inside the house was unreasonable under the circumstances. Therefore, the Court grants summary judgment in favor of the Defendants and against Plaintiff Ericka Fabiszak on her Fourth Amendment excessive force claim.

2.      *Sixth and Fourteenth Amendment Claims*

a.     Sixth Amendment

Count I(B) of the Complaint alleges that the Defendants deprived the Plaintiffs of their right to be informed of the nature and cause of the accusations against them in violation of the Sixth Amendment, applicable to the states through the Fourteenth Amendment. *See Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (citation omitted). The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. Amend. VI. This is a right in a criminal proceeding. *See Turner v. Rogers*, 564 U.S. 432, 441 (2011). Thus, the Sixth Amendment rights attach "only at or after the time that adversary judicial proceedings have been initiated against [the defendant]." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972); *see Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008); *United States v. MacDonald*, 456 U.S. 1, 6 (1982) ("A literal reading of the Amendment suggests that this right attaches only when a formal criminal charge is instituted and a criminal prosecution begins."); *Jacobs v. Paynter*, 727 F. Supp. 1212, 1218 (N.D. Ill. 1989) (recognizing that the right to be informed of the nature and cause of the accusation attaches only when a formal criminal charge is instituted and a criminal prosecution begins). For purposes of the Sixth Amendment, the commencement of a criminal prosecution occurs at the "initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby*, 406 U.S. at 689; *see Rothgery*, 554 U.S. at 198.

As argued by the Defendants, the Complaint contains no factual allegations regarding any criminal proceedings brought against the Plaintiffs for their conduct during this encounter with the officers on July 9, 2021. The factual allegations relate only to the Defendants' warrantless entry into the Plaintiffs' house and the force used on the Plaintiffs, ending chronologically with

25

the allegations that the Cedar Lake Officers assaulted and battered the Plaintiffs at their home. Compl. ¶¶ 23, 24. In other words, the Complaint does not plead any facts to allow the reasonable inference that the Sixth Amendment attached while the Defendants were interacting with the Plaintiffs. On the claims pled in the Complaint, the Defendants are entitled to summary judgment on the Sixth Amendment claim.

b.        Fourteenth Amendment Due Process and Equal Protection

Count I(C) of the Complaint alleges, with no factual support, that the Defendants violated the Plaintiffs' right not to be deprived of life, liberty, or property without due process of law and the right to equal protection, both secured by the Fourteenth Amendment.[5] The Fourteenth Amendment provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

A Fourteenth Amendment due process claim requires a plaintiff to show (1) a deprivation of a protected liberty or property interest; and (2) the deprivation occurred without due process. *See Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 870 (7th Cir. 2009) (citation omitted). The Defendants argue that the Complaint alleges no facts suggesting that the Plaintiffs were deprived of a protectable interest in property or liberty other than the warrantless search and the alleged use of excessive force, both of which implicate the Fourth Amendment as addressed above. And as discussed in the context of the Sixth Amendment claim,

---

[5] Although the Complaint also cites the Fifth Amendment for this claim, the Plaintiffs' due process and equal protection claims against these municipal actors arise under the Fourteenth Amendment. *See Massey v. Wheeler*, 221 F.3d 1030, 1036 n. 1 (7th Cir. 2000) ("The Fourteenth Amendment creates a due process right against the states . . . while the Fifth Amendment guarantees due process by the federal government." (internal citations omitted)); *Conley v. United States*, 5 F.4th 781, 788 n.1 (7th Cir. 2021) ("The Equal Protection Clause of the Fourteenth Amendment applies only to the States, but it has been 'reverse-incorporated' to apply to the federal government as a component of the Fifth Amendment's Due Process Clause." (citation omitted)).

the Complaint alleges no claim based on the Plaintiffs being detained or charged with a crime. Accordingly, the Court grants the Defendants' motion for summary judgment on the Plaintiffs' Fourteenth Amendment due process claim in Count I(C).

A Fourteenth Amendment equal protection claim based on membership in a protected class requires the Plaintiffs to show that they are part of a protected class, they are otherwise similarly situated to members of the unprotected class, and they were intentionally treated differently than members of the unprotected class. *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (citation omitted). And "on some rare occasions, a plaintiff who is not a member of a protected class may nevertheless succeed on an equal protection claim" under a "class of one" theory. *Ind. Land Tr. #3082 v. Hammond Redev. Comm'n*, 107 F.4th 693, 698 (7th Cir. 2024). To prevail on a "class of one" equal protection claim, the Plaintiffs must show that they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* (cleaned up). The Defendants argue that the Plaintiffs have not alleged facts to show that they are members of any legally protected class let alone that the Defendants subjected them to any unequal treatment. The Defendants further argue that unequal treatment cannot be inferred from the factual allegations of the Complaint or the Plaintiffs' testimony. The Plaintiffs' response brief does not address their equal protection claim, abandoning it. Therefore, the Court grants summary judgment in favor of the Defendants on the equal protection claim in Count I(C).

c.    Claims alleged for the first time in response to summary judgment

In their response brief, with no citation to law, the Plaintiffs make new factual allegations in support of their Sixth and Fourteenth Amendment claims related to criminal charges brought against them by the Lake County, Indiana, prosecutor based on a probable cause affidavit sworn by Defendant Officer Dills. Resp. 14, ECF No. 34. And in their Statement of Additional Material

Facts, the Plaintiffs offer evidence regarding criminal proceedings against Billy based on Officer

Dills' probable cause affidavit and criminal proceedings initiated against the Plaintiffs based on

probable cause affidavits sworn by Defendant Officer Corbin. *See* Stmt. Add'l Mat. Facts

¶¶ 115–126, ECF No. 35.

The Defendants object to these Sixth and Fourteenth Amendments claims raised for the

first time in response to summary judgment as not properly before the Court. *See Conner v. Ill.*

*Dep't of Nat. Res.*, 413 F.3d 675, 679 (7th Cir. 2005). The Defendants correctly note that the

Complaint alleges no facts concerning a probable cause affidavit or any criminal charges or

proceedings against the Plaintiffs and that the Plaintiffs' answers to interrogatories raised no

such issues when the Plaintiffs were asked to detail each act or omission of the Defendants on

which their claims against the Defendants are based. *See* Exs. E, F, ECF Nos. 39-1, 39-2. In

addition, the Complaint alleges no facts regarding charges against Billy, and the Plaintiffs raise

no concerns about charges against Billy in their answers to the Defendants' interrogatories. *See*

*id.* Moreover, Billy is not a plaintiff in this case. Thus, the Defendants were not on notice of

these newly raised Sixth and Fourteenth Amendment claims. *See Conner*, 413 F.3d at 679

(quoting *Sundstrand Corp. v. Standard Kollsman Indus., Inc.*, 488 F.2d 807, 811 (7th Cir.

1973)).

Although "district courts retain discretion to interpret new factual allegations or claims

presented in a plaintiff's [summary judgment response brief] as a constructive motion to amend,"

"[i]t will rarely be appropriate to do so." *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488, 490 (7th

Cir. 2023); *see Ollison v. Gossett*, 136 F.4th 729, 740 (7th Cir. 2025). Such is the case here. The

Plaintiffs offer no argument, law, or analysis acknowledging these as new claims, do not

explicitly ask for leave to amend the Complaint, and offer no explanation for why they did not

bring these claims from the outset. Nor do the Plaintiffs offer any explanation, much less "good

cause," for waiting until this stage of the litigation to assert these claims when the deadline to amend pleadings was October 30, 2023. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). While the Complaint cites the Sixth and Fourteenth Amendments, the Complaint contains no factual allegations to support these claims. *See Conner*, 413 F.3d at 679. The factual allegations in the Complaint end with the physical altercation between Bryan and the officers at the Plaintiffs' home on July 9, 2021. Notably, the Plaintiffs did not seek leave to file additional briefing in support of these new claims once the Defendants objected. Accordingly, the Court declines to consider the Plaintiffs' arguments as a constructive motion to amend and strikes these new claims and the supporting evidence from the Plaintiffs' filings.

Even if the Court were to construe these new arguments as a motion to amend, the Court would "apply the familiar standards governing when leave to amend should be granted, paying particular attention to the potential for prejudice to other parties" as set forth in Federal Rule of Civil Procedure 15(a). *Schmees*, 77 F.4th at 490. The Seventh Circuit also requires that a party seeking amendment first show "good cause for modifying the scheduling order" under Rule 16(b)(4) before reaching the Rule 15 question. *Sumrall v. LeSea, Inc.*, 104 F.4th 622, 630 (7th Cir. 2024). Here, there is no showing of good cause for the late amendment under Rule 16(b)(4) and there is both "undue delay" and "undue prejudice to the defendants" under Rule 15(a) for the late assertion of these claims. *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) (quoting *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008)).

Thus, in the alternative to striking these portions of the Plaintiffs' briefing and evidence, the Court denies both leave to amend the scheduling order and leave to amend to bring these claims. As a result, the Court does not consider the evidence regarding any criminal proceedings initiated against the Plaintiffs or Billy.

4.    *Eighth Amendment*

The Defendants move for summary judgment on the claim in Count I(D) brought under the Eighth Amendment, applicable to the states through the Fourteenth Amendment, on the basis that "[t]he Eighth Amendment right to be free from cruel and unusual punishment is applicable only to those criminals who are serving a sentence." *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir. 1988) (citation omitted); *see Ollison*, 136 F.4th at 732 n.2 ("The Eighth Amendment is applicable to the states through the Fourteenth Amendment." (citation omitted)). In response, the Plaintiffs withdraw their Eighth Amendment claim. Accordingly, the Court grants summary judgment for the Defendants on the Plaintiffs' Eighth Amendment claim in Count I(D).

5.    *Monell Liability—Defendant The Town of Cedar Lake, Indiana*

Municipalities can only be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Thus, a plaintiff must provide evidence of "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 986 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

The Defendants argue that there is no evidence to support a *Monell* claim against The Town of Cedar Lake. In response, the Plaintiffs cite only the Defendants' interrogatory responses that there are no written policies or procedures for entering a residence without a warrant. However, it is not reasonable to infer that the absence of a written policy on a certain practice

equates to an unconstitutional practice or custom. In fact, the remainder of the officers' same interrogatory responses shows that there is an express policy regarding the exigent circumstances exception to the warrant requirement to enter a residence:

> Cedar Lake Police Officers are not to violate constitutional rights if required to enter a residence without a warrant. Exceptions to the warrant requirement occur when the needs of law enforcement are so compelling that warrantless search is objectively reasonable. These exceptions known as "exigent circumstances," include: (1) situations in which the occupant of a residence is injured or is in danger of imminent injury; (2) when there is a danger posed to others by the occupant of a dwelling, as when the occupant is armed and might shoot at the police or other persons; (3) when police are in "hot pursuit" of a fleeing suspect or there is a risk that the suspect may escape; and (4) when the entry is necessary to prevent the imminent destruction of evidence.

Exs. 13–16, Ans. 23, ECF Nos. 35-13 to 35-16. The Plaintiffs offer no evidence of any unconstitutional practice regarding the warrantless entry of a home much less a practice that is so permanent and well-settled as to constitute a custom with the force of law. Notably, the Plaintiffs do not assert a basis for *Monell* liability for any of their other federal constitutional claims, including the Fourth Amendment excessive force claim. For these reasons, the Court grants summary judgment for Defendant The Town of Cedar Lake, Indiana on the Plaintiffs' *Monell* claim in Count I.

**B.    Indiana State Law Claims**

*1.    Assault and Battery (Count III)*

Under Indiana law, "[a] law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to enforce a criminal law or to effect a lawful arrest." Ind. Code § 35-41-3-3(c) (eff. July 1, 2021) (previously found at Ind. Code § 35-41-3-3(b)). "If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) (citing *Crawford v. City of Muncie*, 655 N.E.2d 614, 622 (Ind. Ct. App. 1995), *trans. denied*; *City of South Bend v.*

*Fleming*, 397 N.E.2d 1075, 1077 (Ind. Ct. App. 1979)); *see Thompson v. City of Indianapolis*, 208 F. Supp. 3d 968, 977 (S.D. Ind. 2016) (citing *Wilson*, 929 N.E.2d at 203; *Crawford*, 655 N.E.2d at 622; *Fleming*, 397 N.E.2d at 1077). "Indiana's excessive force standard effectively parallels the federal [Fourth Amendment] standard," and "[a]ny claim that excessive force was used by a police officer when making an arrest is analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution." *Thompson*, 208 F. Supp. 3d at 977 (citations omitted).

Generally, government entities and employees acting within the scope of employment are immune from liability under the Indiana Tort Claims Act (ITCA) for losses resulting from the enforcement or failure to enforce a law. *See* Ind. Code § 34-13-3-3(8) ("A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he . . . enforcement of or failure to . . . enforce . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment."). However, this immunity does not extend to a law enforcement officer's use of force in excess of the reasonable force authorized under Indiana Code § 35-41-3-3(c). *Wilson*, 929 N.E.2d at 201–02, 203–04 (citing the prior version at Ind. Code § 35-41-3-3(b)).

On the Plaintiffs' assault and battery claims, the Defendants argue only that the officers' use of force was objectively reasonable for the same reasons advanced in opposition to the Plaintiffs' § 1983 Fourth Amendment excessive force claims. Thus, for the reasons set forth above in Part A(1)(b) addressing those Fourth Amendment claims, the Court grants summary judgment for the Defendants on Plaintiff Ericka Fabiszak's state law claims of assault and battery in Count III because Officer Dills' use of force was objectively reasonable. And, the Court denies summary judgment on Plaintiff Bryan Fabiszak's state law claims of assault and

battery in Count III because there are genuine disputes of material fact as to whether the officers'
use of force was objectively reasonable.

Under the ITCA, the individual defendant officers, as government employees, cannot be
sued personally for Bryan's state law assault and battery claims because "the complaint, on its
face, alleges that the employee's acts leading to the claim occurred within the scope of
employment" and no evidence has been offered to the contrary. *Bushong v. Williamson*, 790
N.E.2d 467, 471, 473 (Ind. 2003) (citing Ind. Code § 34-13-3-5(b)). But the Plaintiffs can bring
Bryan's assault and battery claims against The Town of Cedar Lake. In Indiana, "[t]he general
rule is that vicarious liability will be imposed upon an employer under the doctrine of *respondeat
superior* where the employee has inflicted harm while acting 'within the scope of employment.'"
*Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008) (citations omitted). The Complaint alleges that
the officers were "the employees, agents and servants of" the Cedar Lake Police Department at
the time they allegedly used excessive force against Bryan. Compl. ¶¶ 9–13, 25, 28, 36, 42; *see
Thompson*, 208 F. Supp. 3d at 977 (allowing state law tort claims against the City of Indianapolis
to proceed based on respondeat superior liability for alleged excessive force by its police officers
when there were questions of material fact regarding the use of force)). Accordingly, Plaintiff
Bryan Fabiszak's state law claims of assault and battery in Count III remain pending against
Defendant The Town of Cedar Lake, Indiana.

*2.    Intentional Infliction of Emotional Distress (IIED) (Count II)*

In Count II, the Plaintiffs allege that the officers' conduct of knocking down,
handcuffing, and beating Bryan in the Plaintiffs' home in front of Billy was extreme and
outrageous, recklessly causing severe emotional distress to the Plaintiffs. Compl. ¶¶ 39–41. The
Defendants argue that summary judgment is proper on this IIED claim against the individual
officer defendants because the alleged acts occurred within the scope of their employment with

the Cedar Lake Police Department. *See Bushong*, 790 N.E.2d at 471, 473 (citing Ind. Code § 34-13-3-5(b)); Compl. ¶¶ 9–13, 25, 28, 36. In response, the Plaintiffs dismiss this claim against the individual officers. Accordingly, the Court grants summary judgment on the Plaintiffs' IIED claim in Count II in favor of Defendants Corporal Jake Huppenthal, Sergeant Eric Godoy, Patrolwoman Alexis Dills, and Patrolman Dustin Corbin.

The Defendants also move for summary judgment on this IIED claim against The Town of Cedar Lake based on the same government immunity. *See* Ind. Code § 34-13-3-3(8). "This immunity applies to 'add on' claims such as intentional infliction of emotional distress." *Stewardson v. Cass County*, No. 3:18-CV-958, 2021 WL 878726, at *8 (N.D. Ind. Mar. 9, 2021) (citing *City of Anderson v. Weatherford*, 714 N.E.2d 181, 185–86 (Ind. Ct. App. 1999); *Chapman v. Indiana*, No. 3:13-CV-730, 2014 WL 1831161, at *4 (N.D. Ind. May 8, 2014); *Ashcraft v. City of Crown Point*, No. 2:13-CV-80, 2013 WL 5934612, at *6 (N.D. Ind. Nov. 5, 2013)), *on reconsideration in part*, No. 3:18-CV-958, 2021 WL 4806373 (N.D. Ind. Oct. 14, 2021), and *aff'd sub nom. Stewardson v. Titus*, 126 F.4th 1264 (7th Cir. 2025); *see Parish v. City of Elkhart*, No. 3:07-CV-452, 2010 WL 4054271, at *4 (N.D. Ind. Oct. 15, 2010) ("Common law 'add-on' torts, such as [IIED], are not exceptions to the law enforcement immunity under the ITCA."). This is true even when the add-on claim relates to a claim that escapes the immunity provision of the ITCA, such as Bryan's assault and battery claims. *Stewardson*, 2021 WL 878726, at *8 (add-on claim of IIED relates to claims of assault and battery); *Stewart v. City of Fort Wayne*, No. 1:17-CV-346, 2019 WL 1545179, at *5 (N.D. Ind. Apr. 8, 2019) (add-on claim of negligent infliction of emotional distress relates to negligence claim (citing *Foster v. Land*, No. 2:16-CV-45, 2016 WL 3971699, at *6 (N.D. Ind. July 25, 2016))), *aff'd sub nom. Stewart v. Parkview Hosp.*, 940 F.3d 1013 (7th Cir. 2019); *Foster*, 2016 WL 3971699, at *6 ("'[A]dd on' claims 'such as negligence and intentional infliction of emotional distress do not survive simply

because they are a product of improper conduct,' even when they relate to a claim that escapes the immunity provision such as false arrest or false imprisonment." (citations omitted)).[6]

The Plaintiffs offer no response to this assertion of immunity. Accordingly, the Court grants summary judgment for Defendant The Town of Cedar Lake, Indiana on the Plaintiffs' IIED claim in Count II.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS in part and DENIES in part the Defendants' Motion for Summary Judgment [ECF No. 31].

The Court GRANTS summary judgment for the Defendants and against the Plaintiffs on the following § 1983 claims: (1) Fourth Amendment warrantless entry in Count I(A) against the individual Defendant officers; (2) Fourth Amendment excessive force brought by Plaintiff Ericka Fabiszak in Count I(A); (3) *Monell* liability in Count I; (3) Sixth Amendment right to be informed of the nature and cause of the accusations against them in Count I(B); (4) Fourteenth Amendment due process and equal protection in Count I(C); and (5) Eighth Amendment cruel and unusual punishment in Count I(D).

---

[6] Sister courts in the United States District Court for the Southern District of Indiana have held that there is no tort immunity when the add-on tort of IIED relates to underlying conduct constituting excessive force. *See Wynn v. City of Indianapolis*, No. 1:20-CV-1638, 2022 WL 1120490, at *24 (S.D. Ind. Apr. 14, 2022) ("To determine whether a claim is barred by law enforcement immunity, courts must look to the conduct forming the foundation of the claim, rather than relying on the legal theory upon which the claim is based. If conduct constituting excessive force is the foundation of the tort claim, the claim is not barred by the law enforcement immunity provision." (citing *Bowens v. City of Indianapolis*, No. 1:13-CV-72, 2014 WL 4680662, at *7 (S.D. Ind. Sept. 19, 2014))); *McKinney v. Vigo Cnty. Sheriff's Dep't*, No. 2:19-CV-413, 2021 WL 1268109, at *8 (S.D. Ind. Apr. 6, 2021); *Wynn v. City of Indianapolis*, 496 F. Supp. 3d 1224, 1235 (S.D. Ind. 2020); *Windle v. Indiana*, No. 1:18-CV-1212, 2019 WL 6724605, at *9 (S.D. Ind. Dec. 10, 2019); *but see Williams v. Indianapolis Metro. Police Dep't*, No. 1:18-CV-2566 2019 WL 2744704, at *4 (S.D. Ind. July 1, 2019) ("Courts have long held that Indiana law bars claims for intentional infliction of emotional distress deriving from allegations that police officers used excessive force while exercising their duty to enforce the law." (citing *Thompson v. City of Indianapolis*, 2017 WL 4365967, at *14 (S.D. Ind. Feb. 7, 2018))).

The Court DENIES summary judgment on Plaintiff Bryan Fabiszak's § 1983 Fourth Amendment excessive force claim brought against Defendants Corporal Jake Huppenthal, Sergeant Eric Godoy, Patrolwoman Alexis Dills, and Patrolman Dustin Corbin.

On the state law claims, the Court (1) GRANTS summary judgment for all Defendants on the Plaintiffs' Intentional Infliction of Emotional Distress claim in Count II; (2) GRANTS summary judgment for all Defendants on Plaintiff Ericka Fabiszak's claims of assault and battery in Count III; (3) GRANTS summary judgment for individual Defendants Corporal Jake Huppenthal, Sergeant Eric Godoy, Patrolwoman Alexis Dills, and Patrolman Dustin Corbin on Plaintiff Bryan Fabiszak's claims of assault and battery in Count III; and (4) DENIES summary judgment as to Defendant The Town of Cedar Lake, Indiana on Plaintiff Bryan Fabiszak's claims of assault and battery in Count III.

The Court further DISMISSES with prejudice the claims against Defendant Cedar Lake Police Department and DIRECTS the Clerk of Court to terminate Defendant Cedar Lake Police Department on the docket.

Accordingly, the case remains pending on Plaintiff Bryan Fabiszak's (1) § 1983 Fourth Amendment excessive force claim against Defendants Corporal Jake Huppenthal, Sergeant Eric Godoy, Patrolwoman Alexis Dills, and Patrolman Dustin Corbin and (2) Indiana state law assault and battery claims against Defendant The Town of Cedar Lake, Indiana.

Pursuant to 28 U.S.C. § 636, this case is REFERRED to Magistrate Judge Abizer Zanzi for the purpose of holding a settlement conference.

SO ORDERED on September 9, 2025.

 s/ Theresa L. Springmann    
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT